UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JAIMIE HILEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:18-mc-00340 |
| | ) | |
| INTERNET WINES & SPIRITS CO., | ) | (Case No. 3:17-cv-00165-SMY-DGW, |
| d/b/a Randall's Wine & Spirits, and | ) | United States District Court for the |
| GEORGE RANDALL, | ) | Southern District of Illinois) |
| | ) | |
| Defendants. | ) | |

**Non-Party Mandy Murphey's Memorandum in Support of
<u>Her Motion to Quash Defendants' Subpoena</u>**

**Introduction**

The underlying case between Plaintiff Jaimie Hileman and Defendants Internet Wines & Spirits Co. ("IWS"), d/b/a Randall's Wine & Spirits, and George Randall is the third round of litigation between them. In round one, Ms. Hileman, who is transgender, sued Defendants in federal court in East St. Louis, Illinois, for employment discrimination. The first lawsuit was settled pursuant to an agreement that includes a non-disparagement provision.

Thereafter, Ms. Hileman was interviewed by non-party Mandy Murphey, a television reporter and anchor for KTVI, LLC (Fox 2 News) in St. Louis, and mentioned in a broadcast news report about the transgender community. In round two of the parties' dispute, Defendants sued Ms. Hileman in Illinois state court, alleging that she had breached the non-disparagement provision in the settlement agreement even though the broadcast news report did not even mention Defendants. The Illinois state courts rejected Defendants' lawsuit on summary judgment.

- 2 -

In round three, Ms. Hileman filed the underlying case in federal court in East St. Louis, alleging that Defendants unlawfully retaliated against her by filing the Illinois state court lawsuit. In an apparent attempt to relitigate their failed lawsuit, Defendants have subpoenaed Ms. Murphey for a deposition and have demanded that she produce all materials related to her interview of Ms. Hileman. (Exhibit 1, Subpoena). Although they already have a copy of the broadcast news report, Defendants apparently seek to discover what Ms. Hileman said to Ms. Murphey that was not mentioned in the broadcast news report.

The Court should quash Defendants' subpoena to Ms. Murphey because Defendants improperly seek to invade the reporter's privilege held by Ms. Murphey. Defendants cannot overcome the privilege because the requested information does not go to the heart of, and, indeed, is not even relevant to, the underlying case. The Illinois state courts have already determined that Defendants' state court lawsuit against Ms. Hileman was meritless, so the only remaining issue is Defendants' motive for filing the state court lawsuit. Defendants' motive does not depend on the content of Ms. Hileman's off-the-air statements to Ms. Murphey because Defendants did not even know about those statements when they sued Ms. Hileman. To the contrary, as the Illinois Appellate Court concluded, Defendants filed the state court lawsuit based on the content of the aired news report, not what Ms. Hileman might have said to Ms. Murphey off-the-air. Moreover, Defendants cannot overcome the reporter's privilege because they have not exhausted alternative sources of information, including Ms. Hileman.

**Statement of Facts**

The following facts are drawn from Ms. Hileman's complaint in the underlying lawsuit (attached as Exhibit 2), Defendants' answer (Exhibit 3), Defendants' motion to dismiss (Exhibit 4), the federal district court's May 30, 2017 order denying Defendants' motion to dismiss (Exhibit 5), and the Illinois Appellate Court's decision in IWS's state court lawsuit against Ms. Hileman (Exhibit 6).

Mr. Randall is the owner of IWS. (Exhibits 2-3, Complaint and Answer ¶ 8). Ms. Hileman worked for IWS from October 2011 to March 2015. (*Id.* ¶ 9). In August 2013 and December 2013, she filed discrimination charges against IWS under federal and Missouri law with the Equal Employment Opportunity Commission ("EEOC") and the Missouri Commission on Human Rights ("MCHR") based on Mr. Randall's alleged conduct. (*Id.* ¶ 10). In her first charge, she claimed that Defendants discriminated against her when she told them she planned to transition from male to female and that following her announcement, Mr. Randall told her that she was creating a huge risk of exposure for IWS, began criticizing her performance, and demoted her. (*Id.*). In her second charge, she alleged additional acts of retaliation by Defendants. (*Id.*).

In December 2014, Ms. Hileman sued Defendants in the United States District Court for the Southern District of Illinois. (*Id.* ¶ 11). The parties settled the case pursuant to a settlement agreement, which, among other things, involved Ms. Hileman's separation from IWS and included a non-disparagement clause. (*Id.* ¶¶ 12, 16-17).

Thereafter, Ms. Murphey interviewed Ms. Hileman in connection with a news report relating to the transgender community that aired on KTVI, LLC (Fox 2 News) on November 12, 2015. (*Id.* ¶ 13).

On February 8, 2016, IWS sued Ms. Hileman in the Circuit Court of St. Clair County, Illinois, for allegedly breaching the non-disparagement clause in the settlement agreement, for defamation per se, and defamation per quod because of the broadcast news report. (Exhibit 2, Complaint ¶¶ 16-17). The trial court granted summary judgment in favor of Ms. Hileman on June 21, 2017, and the Illinois Appellate Court affirmed the summary judgment on April 30, 2018. *Internet Wine & Spirits Co. v. Hileman*, 2018 IL App (5th) 170268-U (copy attached as Exhibit 6).

In its decision, the Illinois Appellate Court recounted that IWS had alleged that:

- Ms. Hileman "materially breached the terms of the [settlement agreement] by falsely reporting to Mandy Murphey that she was 'fired' from IWS."

- Ms. Hileman "appeared in a television interview with [Murphey] on Fox 2 News."

- "[D]uring the Fox 2 News report, Murphey reported that [Ms. Hileman] was 'fired' from her job as an executive in 'wine and spirits industry,' IWS, as a result of alleged transgender discrimination."

- "The untrue assertion that [Ms. Hileman] was 'fired' due to being transgender directly criticizes, denigrates, and disparages IWS because it discredits and damages IWS' reputation in the community, in direct contravention of the requirement of the [settlement] agreement that [Ms. Hileman] not 'criticize, denigrate, or disparage IWS and that she would not make statements that would 'damage [IWS's] reputation.'"

*Id.* ¶ 4. **In granting summary judgment, the appellate court observed: "[I]t is undisputed that Murphey never stated in her on-the-air report that [IWS] fired [Ms. Hileman]. In fact, it is undisputed that [IWS] was not mentioned in the report at all."** *Id.* ¶ 14.

After IWS sued her, Ms. Hileman filed another discrimination charge with the EEOC and the MCHR. (Exhibits 2-3, Complaint and Answer ¶ 22). On February 16, 2017, Ms. Hileman filed the present lawsuit against IWS and Mr. Randall in the Southern District of Illinois, asserting that Defendants retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Missouri Human Rights Act, Mo. Rev. Stat. § 213.070, by filing and prosecuting their state court lawsuit against her. Defendants filed a motion to dismiss on April 10, 2017 (Exhibit 4), which the federal district court denied on May 30, 2017 (Exhibit 5).

On April 27, 2018, Defendants served a subpoena on Ms. Murphey, seeking her testimony at a deposition in Clayton, Missouri, and requesting that she produce the following at her deposition: "All documents, files, impressions, recordings, interview notes, etc., relating to Murphey's preparation for the interview of Jaimie Hileman and Murphey's interview of Jaimie Hileman." (Exhibit 1). This broad request would include, among other things, Ms. Murphey's personal research and newsgathering notes, along with video outtakes (video taken in the newsgathering process but never broadcast).

**Argument**

1. **Defendants' subpoena to Ms. Murphey should be quashed because it improperly invades the reporter's privilege.**

Federal Rule of Civil Procedure 45(d)(3)(A)(iii) provides that "[o]n timely motion, the court for the district where compliance is required must quash or modify a subpoena that: … (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies."

Here, Defendants' subpoena would require Ms. Murphey to disclose information protected from disclosure under the reporter's privilege. The Court, therefore, should quash Defendants' subpoena.

### A. Ms. Murphy is entitled to invoke the reporter's privilege, both as to confidential and non-confidential information obtained in gathering and delivering the news.

The news media is not an ordinary business. It engages in the gathering and delivery of news, the only private activity explicitly protected in the United States Constitution. Because journalists often become witnesses to events that lead to legal actions, and because regular subpoenas of journalists and their work product would inhibit their ability to do their jobs, courts in Missouri and elsewhere have recognized a qualified reporter's privilege. *See State ex rel. Classic III Inc. v. Ely*, 954 S.W.2d 650 (Mo. Ct. App. 1997); *Cont'l Cablevision, Inc. v. Storer Broad. Co.*, 583 F. Supp. 427 (E.D. Mo. 1984).[1] "'[T]he press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired.'" *Classic III*, 954 S.W.2d at 657 (quoting *Zerilli v. Smith,* 656 F.2d 705, 711 (D.C. Cir. 1981)). For this reason, courts often recognize that discovery against the news media should be a last resort and that judges should take into account the fact that subpoenas could burden the news media.

Accordingly, the well-recognized reporter's privilege prohibits use of journalists as witnesses and as sources of documentary evidence unless the party seeking the testimony satisfies a three-part test, showing that:

---

[1] While the underlying case is pending in the Southern District of Illinois, Missouri law governs the privilege issue because Defendants have subpoenaed and noticed Ms. Murphey for deposition in Missouri. *Eckmann v. Bd. of Educ. of Hawthorn Sch. Dist. No. 17*, 106 F.R.D. 70, 72 (E.D. Mo. 1985) (Missouri law governed privilege issue as to non-party witness noticed for deposition in Missouri in case pending in Northern District of Illinois). Even so, Illinois also recognizes the reporter's privilege. *See People v. Pawlaczyk*, 724 N.E.2d 901, 908 (Ill. 2000) ("Illinois allows a qualified privilege of confidentiality for any source of information obtained by a reporter. 735 ILCS 5/8–901 (West 1998). The reporter's privilege has evolved from a common law recognition that the compelled disclosure of a reporter's sources could compromise the news media's first amendment right to freely gather and disseminate information. The purpose of the privilege is to assure reporters access to information, thereby encouraging a free press and a well-informed citizenry." (citations omitted)); *People v. Slover*, 753 N.E.2d 554, 556–57 (Ill. App. Ct. 2001) ("In Illinois, reporters have a statutory, qualified privilege protecting their sources, whether confidential or nonconfidential, from compelled disclosure.").

1. the requesting party has made out a prima facie substantial case in the underlying action in which the journalist's testimony or documents are sought;

2. the testimony or documents requested go to the heart of that case; and

3. the requesting party has exhausted all alternative means of obtaining the elements of proof for which the testimony or documents are sought.

*See United States v. Cuthbertson*, 630 F.2d 139 (3rd Cir. 1980); *United States v. Burke*, 700 F.2d 70, 76-78 (2d Cir. 1983); *Farr v. Pitchess*, 522 F.2d 464 (9th Cir. 1975); *Bursey v. United States*, 466 F.2d 1059 (9th Cir. 1972); *United States v. Smith*, 1996 WL 371702 (E.D. La. 1996); *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981); *In Re Petroleum Products Antitrust Litigation*, 680 F.2d 5 (2d Cir. 1982); *Bruno & Stillman Inc. v. Globe Newspaper Co.*, 633 F.2d 583 (1st Cir. 1980); *Cervantes v. Time, Inc.*, 464 F.2d 986, 994 (8th Cir. 1972); *Whitney v. O'Hara*, 11 Media L.Rptr. 1607 (W.D. Mo. 1985); *Classic III*, 954 S.W.2d 650.

The privilege covers information witnessed by journalists in their capacity as journalists. *See e.g., In Re Paul*, 27 Media L. Rptr. 1897, 1900 (Ga. March 8, 1999) (reporter protected by journalist's privilege and need not testify as to his interview with criminal defendant); *State of Florida v. Leyhan*, 27 Media L. Rptr. 1735, 1736 (Fla. Cty. Ct. Palm Beach Cty. March 19, 1999) (refusing to compel reporter to testify regarding traffic violation because reporter was "actively gathering news and was therefore protected by the first amendment-based reporters' privilege"; where state could probably prove its case without journalist witness, it could not meet test for overcoming journalist's privilege).

The reporter's privilege protects far more than just the identify of confidential sources; it also protects non-confidential information and source material. *Shoen v. Shoen*, 5 F.3d 1289, 1294 (9th Cir. 1993) ("[W]e hold that the journalist's privilege applies to a journalist's resource

materials even in the absence of the element of confidentiality"); *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988) (lurking threat exists to journalists if disclosure of even non-confidential information becomes routinely compelled); *United States v. Cuthbertson*, 630 F.2d 139, 147 (3rd Cir. 1980) (compelling disclosure of non-confidential material "may substantially undercut the public policy favoring the free flow of information that is the foundation for the privilege."); *Cont'l Cablevision, Inc. v. Storer Broadcasting Co.*, 583 F.Supp. 427 (E.D. Mo. 1984) (First Amendment qualified reporter's privilege recognized in Missouri; privilege applies not only to identity of confidential sources but also to non-confidential source material).

The underlying concerns of the reporter's privilege relate to the "pivotal function of reporters to collect information for public dissemination" and the "paramount public interest in the maintenance of vigorous, aggressive, independent press capable of participating in robust, unfettered debate over controversial matters." *Gonzales v. National Broadcasting Co.*, 194 F.3d 29 (2d Cir. 1999). These concerns, the Second Circuit held in *Gonzales*, are relevant regardless of whether information sought from the press is confidential:

> If the parties to any lawsuit were free to subpoena the press at will, it would likely become standard operating procedure for those litigating against an entity that has been the subject of press attention to sift through press files in search of information supporting their claims. The resulting wholesale exposure of press files to litigant scrutiny would burden the press with heavy costs of subpoena compliance, and can otherwise impair its activity to perform its duties, particularity if potential sources were deterred from speaking to the press, when they insisted on remaining anonymous, because of the likelihood that they would sucked into litigation. Incentives would also arise for press entities to clean out files containing potentially valuable information lest they incur substantial costs in the event of future subpoenas. And permitting litigants unrestricted, court-enforced access to journalistic resources would risk the symbolic harm of making journalist appear to be an investigative arm of the judicial system, the government, or private parties.

*Id*. at 35. For those reasons, the court in *Gonzales* reaffirmed "that the qualified privilege for journalists applies to nonconfidential, as well as confidential, information." *Id.*

Moreover, the reporter's privilege has repeatedly been held to cover broadcast outtakes because outtakes are classic unpublished material and compelled disclosure of outtakes would constitute a serious intrusion into the journalistic process. *United States ex rel. Vuitton et fils S.A. v. Karen Bags, Inc.,* 600 F.Supp. 667, 671 (S.D.N.Y. 1985) (outtakes covered by privilege); *Coughlin v. Westinghouse Broadcasting and Cable, Inc.,* 603 F.Supp. 377 (E.D. Pa. 1985) (denying motion to compel disclosure of outtakes under reporter's privilege shield law, and explaining that shield law reflected constitutional concerns); *Lauderback v. American Broadcasting Cos.,* 8 Media L. Rptr. 2407 (N.D. Iowa 1982)(upholding broadcaster's refusal to produce outtakes).

### B. Defendants cannot overcome the reporter's privilege because Ms. Murphey's testimony and materials do not go to the heart of the underlying case.

Defendants cannot satisfy the test for overcoming the reporter's privilege because the testimony and materials that Defendants seek from Ms. Murphey do not go to the heart of, and, indeed, are not even relevant to, the underlying case. "The majority view … is that mere relevance is insufficient to compel discovery; disclosure should be denied unless the information goes to the heart of the plaintiff's claim." *Classic III*, 954 S.W.2d at 657.

Ms. Hileman's complaint is for unlawful retaliation. The federal district court denied Defendants' motion to dismiss because "Hileman's Complaint sets forth specific allegations and facts as to how the state court action is meritless and why Hileman believes the sole purpose of that lawsuit was to retaliate against her for engaging in statutorily protected activity – the filing of the initial Charges and the federal lawsuit." (Exhibit 5, p. 4).

The Illinois Appellate Court has already conclusively ruled that Defendants' state court lawsuit against Ms. Hileman was meritless. *Internet Wine & Spirits Co. v. Hileman*, 2018 IL App (5th) 170268-U (Exhibit 6). Thus, the remaining issue is Defendants' motive for filing the state court lawsuit. *See Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (retaliation "determination requires us to ask whether the complained-of conduct entailed a motive that Title VII prohibits); *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739 (8th Cir. 2017) ("The plaintiff's ultimate burden in a Title VII retaliation case is to prove an impermissible retaliatory motive was the 'but-for cause' of the adverse employment action.").

Defendants apparently contend that they filed the state court lawsuit because they believed, based on the broadcast news report, that Ms. Hileman had breached the non-disparagement clause in the settlement agreement. In their motion to dismiss, Defendants argued: "IWS has a good faith, reasonable belief that Plaintiff [Ms. Hileman] violated the terms of the Settlement Agreement during her television appearance, and as such, did not file its lawsuit vexatiously or frivolously." (Exhibit 4, p. 12). Likewise, in their affirmative and other defenses, Defendants contend that: (a) "they would have taken the same action regardless of Plaintiff's alleged opposition to discrimination, as Defendants asserted their rights pursuant to the enforcement of the Settlement Agreement"; and (b) "any decisions made to file its lawsuit to enforce the terms of the Settlement Agreement were based on legitimate, non-retaliatory, and non-discriminatory reasons." (Ex. 3, Answer, p. 6).

Defendants did not know what Ms. Hileman said to Ms. Murphey when they filed their state court lawsuit or before the state trial court entered summary judgment against them. Thus, what Ms. Hileman actually said to Ms. Murphey off-the-air is irrelevant to why Defendants

brought or maintained the state court lawsuit against Ms. Hileman and, in turn, is irrelevant to Ms. Hileman's retaliation claims or Defendants' defenses.

But even if what Ms. Hileman said to Ms. Murphey off-the-air had some relevance (which it does not), it cannot go to the heart of the case as required to overcome the reporter's privilege. As the Illinois Appellate Court recognized, Defendants filed their state court lawsuit against Ms. Hileman because of the content of the news report that aired, not any purported statements that Ms. Hileman made to Ms. Murphey off-the-air: "[IWS] persists in its contention that the damages it purports to have suffered resulted from Murphey's *broadcast*, not from what would have been the actual breach of the contract [the settlement agreement]: [Ms. Hileman's] purported off-the-air statement Murphey that [IWS] fired [Ms. Hileman]." *Internet Wine & Spirits Co. v. Hileman*, 2018 IL App (5th) 170268-U, ¶ 14 (Exhibit 6).[2]

Because there appears to be no way in which Ms. Murphey's testimony will go to the heart of this case, it is not necessary or proper to remove Ms. Murphey from her journalistic duties and inquire into her news reporting. The Court should quash the subpoena.

---

[2] The Illinois Appellate Court further explained: "In the absence of any mention of [IWS] in the broadcast, we conclude [IWS's] theory, as pled in the complaint, that it lost profits because of the broadcast amounts to nothing more than the conjecture and sheer speculation rejected by the Illinois Supreme Court in *Midland Hotel*. Accordingly, even were we to assume, *arguendo*, that [Ms. Hileman] breached the agreement in this case by telling Murphey that [IWS] fired [Ms. Hileman], and were we to further assume, *arguendo*, that [IWS] made less profit after the broadcast, we could not conclude that the assumed breach was 'plainly traceable' to the assumed lost profits that [IWS] has tied explicitly, in the complaint, to Murphey's broadcast, because it is undisputed that in the broadcast, Murphey never stated that [IWS] fired [Ms. Hileman], and in fact never mentioned [IWS] at all. In this case, as pled by [IWS] in the complaint…, there is nothing but conjecture and sheer speculation to connect a breach of the agreement by [Ms. Hileman] to the alleged lost profits of [IWS]." *Internet Wine & Spirits Co. v. Hileman*, 2018 IL App (5th) 170268-U, ¶ 14 (Exhibit 6)

### C. Defendants cannot overcome the reporter's privilege because Defendants have failed to exhaust alternative sources.

Even if Defendants could show that the information it seeks from Ms. Murphey somehow goes to the "heart" of the underlying case, they still cannot overcome the reporter's privilege because they cannot show that they have exhausted all alternative sources of the proof they seek. It is settled through many cases that the normal power of a court to subpoena any person's evidence should not be used to compel testimony of journalists when there are reasonable alternatives to such testimony. "Even when the information is crucial to a litigant's case, reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information." *See Zerilli,* 656 F.2d at 713. Thus, compelled disclosure from a journalist must be the last resort after pursuit of other opportunities has failed. *See Shoen*, 5 F.3d at 1297.

Here, discovery in the underlying case is apparently still underway, so Defendants may be able to obtain the proof they need through various methods, including written discovery to Ms. Hileman, a deposition of Ms. Hileman, depositions of other parties with whom Ms. Hileman made statements or discussed her statements to Ms. Murphey, recordings or documents made by Ms. Hileman or others, and other yet unforeseen evidence. Those methods must be fully explored before journalistic testimony and work product are sought, given the First Amendment and other interests in news reporting.

Most litigants, even in cases covered by the news media, are able to obtain appropriate discovery or evidence without intruding into the news media's work and work product. Courts uniformly and consistently demand that litigations use other methods of obtaining information first. When the needed information is obtained from other sources, it obviates any need to breach the reporter's privilege. *See e.g. Zerilli*, 656 F.2d at 713; *Carey*, 492 F.2d at 638 (finding that the

- 13 -

obligation to obtain the requested information from other sources is very substantial, and even requiring the taking of as many as 60 depositions might be a reasonable prerequisite to compelled journalistic disclosure).

The rule requiring exhaustion of alternative sources is a sound one.  If reporters were open to general subpoenas every time a lawyer or investigator wanted to short-circuit his own investigative work, journalists would become effective agents of the government, spending their time providing information to lawyers and courts, at the expense of their own time and, eventually, their credibility with their sources.

Thus, for this additional reason, because Defendants have not exhausted alternative sources of information with respect to the proof they need for their case, they cannot breach the reporter's privilege, and their subpoena to Ms. Murphey should be quashed.

**Conclusion**

In this case, Defendants cannot overcome the reporter's privilege because the testimony and documents they seek from Ms. Murphey do not go to the heart of the case and Defendants have not exhausted alternative sources of information. Accordingly, the Court should quash Defendants' subpoena to Ms. Murphey.

Respectfully submitted,

THOMPSON COBURN LLP

By  /s/ Mark Sableman
Mark Sableman, #36276
Jeffrey R. Fink, #44963
Michael L. Nepple, #42082
One US Bank Plaza
St. Louis, Missouri 63101
314-552-6000
314-552-7000 (Fax)
msableman@thompsoncoburn.com
jfink@thompsoncoburn.com
mnepple@thompscoburn.com

Attorneys for Non-Party Mandy Murphey

**Certificate of Service**

I hereby certify that on May 8, 2018, a copy of the foregoing was sent by electronic mail to:

| | |
|---|---|
| Ferne P. Wolf | Heidi L. Eckert |
| Sowers & Wolf, LLC | Jackson Lewis P.C. |
| 530 Maryville Centre Drive, Suite 460 | 222 South Central Avenue, Suite 900 |
| St. Louis, MO 63141 | Clayton, MO 63105 |
| fw@sowerswolf.com | Heidi.eckert@jacksonlewis.com |

/s/Mark Sableman